The clerk has advised us that everyone has signed in for the day calendar, so we will dispense with the call of the calendar. We'll turn to the first case before us, which is USA v. Robert Hendricks. Good morning. May I proceed? Go ahead, Mr. Earle. With the Court's permission, I want to focus primarily on the evidentiary issues, but just with respect to Barrett, I just want to make one observation, which is that if you accept the premise of Barrett, which is that because 924C does not involve past criminal conduct, but rather conduct for which the defendant is on trial, and therefore you shouldn't use a categorical approach, but rather the underlying conduct approach, that same logic applies to the risk of force clause under A1, and therefore in this case there should be a reversal because the Court directed a verdict for the government on this element. So is your argument that the categorical approach does not survive Barrett at all? That's the logic, yes. That would be the logic. And it's really the government makes this argument at page 65 of their brief where they say that when a statute uses the term offense, they cite Nihauen v. Holder, that such a language in the statute requires an underlying conduct approach, and that's really 924C talks about such an offense. Ultimately, I know yesterday I received an order and a bunch of cases from this Court, staying all of them in light of the fact that there's likely to be Supreme Court review in Hill and Barrett. I know there is a cert petition filed by the government from a First Circuit case, so ultimately I think this is all going to go up and the Supreme Court is going to decide it. But just focusing on the holding of Barrett, I think the logic is that it should apply to A1, and therefore in this case there was a directed verdict. Let me ask you, Mr. Urowitz, what you're after here, essentially why you're here. If you achieve what you want, what's the decreed language? What do you want from us? To vacate his conviction. I mean, because of the evidentiary issues, I would ask for a new trial. In terms of 924C, to vacate the conviction on count two, remand for resentencing. Ultimately, in this case, if there was a resentencing, the defendant, the appellant was sentenced to 30 years. We had originally raised the Beckles issue. Ultimately now the Supreme Court held that the vagueness doesn't apply to sentencing guidelines, but subsequently the sentencing guidelines were amended. And I think if now, if Mr. Hendricks appeared for resentencing, I don't think he would get anything, the 30-year sentence that he did get, which is effectively a life sentence for him. He's 55 years old, a 30-year sentence that's effectively, I think even the government would acknowledge, he was probably the least of the participants. What do you calculate he would receive under the new version of the guidelines? I didn't do the calculation, but I know without the ACCA, I think the ACCA added, I think, another 10 years to his sentence. Why do you say he was the least of the participants? Because certainly he wasn't the one with the gun. I think from all the testimony, it's clear that the two brothers, Schlegel and Taquan, were the ones who were planning this robbery. They identified Robert as a participant. One of them did, and I think that the significance is he also identified Robinson as a participant, and the jury acquitted him. Robinson was the driver outside, though, right? He was the driver outside. Admittedly, there was less evidence, but the point is, Schlegel's testimony was that he was just as much a participant. The jury obviously can never say what the jury believed, but there's, I think, a fair inference that if the jury had believed Schlegel's testimony, they would have convicted Robinson as well. No one identified him. When everybody was first questioned about him, nobody identified Hendrix as the participant. At the time, the closest to the event, and I think it's significant in light of the fact that they say that he had certain facial features that would have been noticeable, but nobody identified him. At some point, they talked about two young kids, him at fifty-five. Wasn't that one of the witnesses' testimony? That was, and Judge Pula, that relates to one of the evidentiary issues that we raised. Mr. Hendrix tried to assert a defense that there was a third-party participant, that there was somebody else who was the third participant. The testimony was it was somebody, Bam Susson, and the judge excluded the picture of Mrs. Susson. We believe that that violated his constitutional . . . Wasn't the picture shown to the jury? No, it was not. They asked for it, but the judge denied it. Was it shown to anyone on the stand? I had a feeling it was in the courtroom. It was admitted subject to connection, but ultimately it was not shown to the jury. The jury, during deliberations, asked for the picture, but they were denied. The government wants to just brush this off, say, oh, it's subject to considerable discretion of the court. We argue that's not the standard here. This is a constitutional right, the right to present a defense. Therefore, it's not subject to the regular discretion. I think if you look at the record . . . Let's go back to an earlier question I asked you. Didn't Robert have a handgun? No, I don't believe so. He pointed a handgun at a couple of people inside the credit union, didn't he? Was the testimony he had a gun? I don't believe that that . . . I believe the testimony was that Shaquille had the gun. Take a look again at it. It sometimes happens in cases like this that the judgment of conviction is affirmed, but we then, of course, have to deal with the sentencing of the defendant. On that question, does it make much difference ultimately to you that we decide in your favor on the proper guidelines to be applied? I'm not sure I understand the question. The crime of violence question, does that really . . . If we assume the affirmance of the conviction, the judge will be free to use his discretion after he's gone through this kabuki theater of the guidelines, but as a practical matter, a good district judge will know how to say that he's considered X, Y, and Z, but he's decided this is the right sentence. Isn't that the case? Is he going to be limited as a practical matter in the sentence that the judge imposes? If I understand the question properly, I think Hendricks, from Hendricks' perspective, he would be very happy with the re-sentence because I think objectively speaking, when you look at the facts, even if the 924C were to survive, I think this sentence was excessive, and I think if we had the opportunity to be before the judge, and like I say, particularly since the guidelines have been amended, I don't think he would get the same sentence. Why don't you take a moment and talk about the evidentiary issues before your time runs out? There's two evidentiary issues. The first question is this issue about the victim testimony, and I think the government admitted highly prejudicial testimony. I think it was deliberate and it was highly inappropriate. Sandra Reeder, this is at 865, was permitted to testify. If I walk around, this is her feelings of what the effect the robbery had on her. If I walk around and there's a group of black men, it bothers me a little bit. I would avoid, if they were standing in front of a store, I would avoid going into that store. That's highly inappropriate testimony, and my understanding is, it's not in the record because I based it on a conversation with counsel, but his recollection was that it was overwhelmingly a white jury. He said he had a recollection that there may have even been a bats in charge during the charge conference. I don't have that. If the court wants supplemental on that, I could get it. Of course it was objected to at the time. It was objected to, it was objected to, and the cases that the government relies on are no support for the government. One of them, the whole issue was whether there was intimidation. That was not the defense here. The defense was this was mistaken identity. The other case, it was a plain error case. It was an element they had to prove, though, right? I'm sorry? It was an element they had to prove. It was an element that they had to prove, and we had no objection to testimony during the robbery where you intimidated, even though that itself is an objective question, so whether subjective evidence should be relevant, but there is some relevance to that, but to then go on. They went beyond that, the witnesses. They went beyond, and repeatedly. At least three witnesses that they did it. So I think between that and . . . I thought it was just Rader. Wasn't it just Rader? No, it was all three we cited in our brief. Rader went the furthest because Rader was permitted to testify about, you know, made this highly prejudicial statement. That's what I mean. There were three witnesses who talked about intimidation, Williams, Ruppert, and Rader, but Rader was the only one to mention the reference to black men, right? It was the only one that referenced black men, but they were all permitted to testify about the effect that the robbery had on them in their future conflict. This is page 17 of my brief. There's quotes in footnote three from all of them. So I think between . . . I see I'm way over, but those two evidentiary issues, I think putting aside the Johnson issue is enough to require reversal here. Thank you. Let me take you back again just a moment to the guidelines question. You didn't respond to the government's arguments regarding the career offender guidelines in the reply brief. Are you abandoning that argument? I believe . . . Regarding the definition of crime of violence under section 924C. Right. So in preparing for the brief, the reason why we didn't reply is because in light of the decision in Beckels, I think prior Second Circuit law was that before this whole issue arose, was that burglary in the second degree would constitute a crime of violence. Thank you. May it please the court. Rajiv Dosanjh for the government. Can I just ask you before you really get started? My reading of the record is that there was plenty of evidence that Robert had a gun and was waving it around and pointing it in people's faces in the bank. Am I right about that? You're correct. He had a gun. He pointed it at someone's face. He threatened her too, right? Right. There was testimony about that. Yeah. The idea that we would agree that he was the least culpable is absolutely not the case. He also, in the initiation of the robbery, Shaquille testified he was the one who decided, let's go to Camden first, let's scope that one out. I know another one in Utica, then Rome. So he was a significant player. Was he the one who told one of his co-defendants to shoot one of his . . . Just smash him, he said. Smash him, right. And he ejected a round from the gun too at that point, right? The person who ejected the gun was, I believe, Taequann, not Robert. Oh, I know. But the person he told to . . . Right, right. Well . . . He said smash him. It's unclear whether he intended that intentionally, but the fact is that he was deeply involved in this. He was one of the armed robbers. And the other guy chambered a round. Right. Turning to the question of Barrett, I don't think there's any validity to the idea that Barrett would allow . . . that the ruling on 924C3B, the residual clause, would bleed over to the elements clause. I think Barrett was very clear and discussed the fact that there should be a distinction. The elements clause, it refers to the element of an offense, and it asks a legal question. And it's appropriate for a judge to answer that. And Barrett talks about the fact that statutes can be interpreted to have two different modes of proof. One question is for the jury. One question is for the judge. So I don't think the idea that you can import the case-specific approach in Barrett back into the elements clause is supported by Barrett at all. I think it's precluded by that. And also the idea here that the judge directed a verdict as to one element. If you look at the Nieder case, Nieder came very close to that same situation. It wasn't just . . . It's often, going back in the case, it's often interpreted as saying, well, if the judge omits an element. But what happened in Nieder is actually that the judge told them, you do not need to consider this element, and effectively withdrew the element from the jury. And it's clear that if you look at the Hedgepeth v. Polito case, which is 555 U.S. 57 at 60 to 61, what it says is that Nieder makes clear that harmless error analysis applies to instructional errors so long as the error at issue does not categorically vitiate all the jury's findings. And it's contrasting the Sullivan case where a judge made a mistake as to the instructions on reasonable doubt, and that affected all the jury's findings. When an error affects just one element, a jury's finding on one element, it's still subject to harmless error. So the notion that this is somehow a structural error is just not supported by the case law. And this court's decision in the United States is v. Needham, 604 F. 3rd, 673. That was abrogated on other grounds, but it applied plain error to where a judge required, instructed the jury that drug trafficking necessarily involves interstate commerce for the purposes of the jurisdictional element of a Hobbs Act charge. So where the judge is essentially instructing them, find that the jurisdictional element has been found, this court still applied plain error. So it's not a structural error that requires you to not consider the harm of the error here. The government would urge this court to decide the matter of the 924C charge based on the elements clause. Robert's argument here is that the mens rea requirement under 2113A encompasses negligent and accidental intimidation. And this is not consistent with the Supreme Court's decision in Carter, which said that the actus reus element has to be knowing. The Ninth Circuit has rejected the very same argument that's been made here. We cite that in page 54 of our brief. And this court has decided the same issue as to 2113D, which is the armed robbery statute in the Killian case, which is also cited in our brief. I think it's very clear that credit union robbery qualifies as a crime of violence under the categorical approach that still applies to C3A. So I think the conviction should be affirmed on that ground. If you do reach the Barrett issue, we would ask that it not be the sole basis to affirm that conviction, but that the elements clause be considered. Turning to the evidentiary issues, I'll just address the concerns. You don't have to decide it on the elements issue, right? Well, I think, Your Honor, I mean, there's Barrett, which would provide a precedent. But to be perfectly frank, I mean, to the extent there is any potential litigation risk down the line for that decision, we would prefer that it be decided on both grounds at least, just because I think it's solid under the elements clause. Turning to the concerns about the testimony of the after effects of the robbery, as we argue, this is a Rule 403 determination. Judges are entitled to great deference when it comes to those decisions. There's case law that makes clear that subjective testimony about a victim's fear during a robbery is relevant to showing the objective element. We all agree with that. It's where this testimony went into the after effects in their life after the robbery that is highly prejudicial and not required to prove any element of guilt. I would disagree. Your Honor, the defendant here did not stipulate to this element. The government still had to prove it, and I do think it's relevant. We cite the Muhammad case in our brief that says it's relevant. What it shows is it shows both the severity of the intimidation. It also shows causation. What the government has to show is that the intimidation caused the turning over of the money. Many banks have policies that say do not resist no matter how slight this risk is. Turn over your money. So here talking about the severity of intimidation does have probative value to show that they were acting under fear, under compulsion of fear. All of that so far has not crossed the line in my mind. What crossed the line is their after effects. Well, that's what I'm talking about, Your Honor. I think it is still relevant. The fact that situations that so the testimony here was from three people. Two of them testified that they couldn't go back to work at a bank because they were afraid. So what that shows is that the situation that reminds them of this robbery is still so raw that the experience that they had was so intense that they still have this feeling. That does show that their subjective belief that they were acting under incredible fear. And it's the memory of that fear that continues with them. Your Honor. For all of this, you rely primarily or almost exclusively on U.S. against Mohammed, which is a summary order of the Third Circuit. Correct. Do we know whether in the Third Circuit Mohammed has presidential force? It varies from circuit to circuit. Your Honor, I admit I have not looked at that. My impression would be that it would have a similar rule here that it's persuasive but not present. Yes. Right. So this is the best support for this theory in response to Judge Pooler's concern. I think it's directly on point here. But I do think that the general proposition that you can show fear at the time through evidence of continued after effects. I agree on fear at the time because that goes to the intimidation element. But afterwards is relevant, I think, for sentencing, not for proving guilt or innocence. But I think it does, Your Honor, I think it does still show fear at the time to say that you have this continuing fear. So situations that remind you of that event continue to. I mean, it's, Your Honor, I understand your skepticism. But, you know, we would also make an argument here that looking at this trial in total, that any error here would be harmless given the extensive evidence. And I don't think that the evidence here was weak. You mentioned the testimony about the three kids running out of the bank. That was from someone who was walking in the parking lot who saw them across the parking lot running out of the bank. There was testimony from Robert that he borrowed the clothes of Tae Kwon frequently. So that shows he's about the same size, he's wearing similar clothing, and he's running. From across the parking lot, you see someone in relatively, if you look at the videos, they're wearing relatively youthful clothing. It's not an unreasonable belief to think those are three kids. And two of them were young men. Just in the moment, to see them coming at you, I don't think it vitiates the government's case to say that that's the way he testified. There's also the testimony, direct testimony from Shaquille. Robert was the one who did it. The fact that the jury acquitted Mr. Robinson, the getaway driver, we have no idea why they did that, Your Honor. It could have been straight sympathy here. That he was not the person, he never went into the bank. He didn't have a gun. The jury could have just simply said, we don't want to acquit him. That also undercuts the idea that this is somehow, this verdict was somehow tainted by racial bias. And speaking of that, Your Honor, whenever issues of race come up in a trial, it does require particular sensitivity. But here, I don't think it's being unrealistic or Pollyanna to say that her testimony may not have about her fear of entering a store and seeing four black men. I don't think it's unrealistic to wonder whether that actually undercut her testimony somewhat in the jury's eyes. It's not necessarily helpful to the government. The government never returned to that testimony. It never made mention of it again. It was in response to a very open-ended question about how this affected you. And she went into this. The government didn't press the matter. The question was objected to, wasn't it? It was after the fact of her testimony. After she testified. After she said those things, there was an objection. And the defense counsel had been objecting to the testimony about the after effects before. But I think the misgenuous objection came when she spoke about her fear in entering a store. Thanks very much. Okay, thank you. Counsel will hear from Ms. Europe with reservation time. Just on the point of Rita's testimony, there was an objection before. The question was, this is at age 65, how did this experience affect you? Answer. Well, Judge, I object. That's irrelevant. Overruled. Can I answer it? I think, as a fair inference, the government knew exactly what she was going to testify to. That's why they asked the question. The AUSA has a lot of faith in the jury as to how they're going to view this. Unfortunately, I'm not so sure I have that faith. Why, I'd like to think that it would have turned off the jurors. Unfortunately, I think that's too much to ask. Judge Roney, I don't know where my head was, but yes, I agree with the government that Mr. Hendricks did have a gun. I would note that he did not receive any enhancement for all. The argument always was, I think, fair inference of the testimony, that it was the two brothers that were planning this robbery and they drew in Robert. The testimony from Rossi was not that there were three kids. It was two kids. Shaquille had already left the bank. So it was just Robert and Taequann that were running out. And I think that's the significance of the picture. Had the government said, oh, there was no evidence as to how old Sessom was, the picture would have been sort of the best evidence. I think if it would have been admitted, you would have seen... He really was a kid. He would have seen that it was a kid. It would have been consistent. And we're not talking about some random person. We're not talking about a situation where somebody finds a picture of someone similar to, looking to what's the appearance of people on the video, and he says, I want to admit this. This was somebody who, by all accounts, even the government says, he certainly was around, aware of the robbery. He went with Shaquille to spend the proceeds. He had telephone contact. He was close friends with it. So we're not talking about some random stranger. And I think the defendant had a constitutional right to present that evidence. Thank you, Your Honor. It's a well-reserved decision.